**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**


TODD KOWALEWSKI                          :
                                         :
                                         :
     v.                                       :          Civil No. CCB-12-3288
                                         :
                                         :
ROBERT M. GATES                          :
                                         :
                                         :


**MEMORANDUM**

     Todd Kowalewski brings this suit against defendant Robert M. Gates for alleged

violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Kowalewski claims

discrimination based on his race and gender, hostile work environment, and retaliation for

protected activity. Now pending before the court are (1) the defendant's motion to dismiss or, in

the alternative, for summary judgment, (2) the defendant's motion to substitute exhibits, (3) the

defendant's motion to file a lengthy reply brief, and (4) Kowalewski's motion to allow time for

discovery. The issues in this case have been fully briefed, and no hearing is necessary. *See*

Local R. 105.6. For the reasons stated below, the motion to dismiss or for summary judgment—

construed as a motion for summary judgment—will be granted, and the motion to allow time for

discovery will be denied. Additionally, the court will grant the motion to substitute exhibits and

the motion to file a lengthy document.

**BACKGROUND**

     On July 20, 2009, Kowalewski started working at the National Geospatial-Intelligence

Agency ("NGA") as a staff officer. He was hired with a two-year "trial or probationary period."

(Def.'s Mot. to Dismiss, ECF No. 10-2, at 2.)[1]  During his probationary period, on March 16,

2010, Kowalewski resigned.  The defendant maintains that he resigned following incidents

involving disrespectful behavior towards his superiors.  Kowalewski, however, asserts that he

faced harassment and discrimination prior to his resignation, and denies that he behaved

inappropriately towards any co-workers.

Claiming that he was constructively discharged, Kowalewski alleges that problems at

work began with his recruitment by Ryan Ross, the son of a supervisor in his chain of command,

Ron Ross.[2]  According to Kowalewski, Ryan Ross made oral promises that he could not keep; as

a result, Kowalewski's salary and relocation expenses were different than he expected, causing

personal difficulties with relocating his family.  (Def.'s Ex. 8, Kowalewski's Recruitment

Compl. to NGA Human Dev.)  Kowalewski provided an undated, written complaint to NGA

Human Development ("HD") regarding his recruitment experiences, (*see id.*; Def.'s Mot. to

Dismiss at 7), and also met with his first-level supervisor, Patrick Clancy, and others about Ryan

Ross's behavior.  (Def.'s Ex. 5, Decl. of Clancy, at 1; *see also* Def.'s Ex. 4, Decl. of Celia

Hopkins, at 1.)  Following his complaints, sometime prior to October 2009, Ron Ross came to

his desk, stating "Tell me about my son.  What's going on with my son?"  (Def.'s Ex. 6, Dep. of

Kowalewski, at 23:23–24:14.)  Kowalewski claims that, during this confrontation, Ron Ross was

"angry," and his voice was loud.  (*Id.* at 27:13–18.)  Ron Ross was eventually removed from

---

[1] According to the defense, because of Kowalewski's status as a probationary employee, he could be removed without first being subjected to "progressive discipline."  (Def.'s Ex. 10, Decl. of Brenda Brooks, at 4–5.)  Kowalewski, however, claims that other probationary employees, including Ryan Ross, received progressive discipline prior to being terminated.  (*See* Sandra G. Radtke Aff., Ex. 3, Nov. 19, 2009, Email from Brandi Lowe.)

[2] Kowalewski explains that he is not alleging that either Ryan Ross or Ron Ross—who are also white men—discriminated against him based on race or gender, created a hostile work environment, or retaliated against him.  Instead, he includes their behavior to show that he "did not have an effective chain of command to utilize" and to provide context for supervisor Lynn Griffin-Bell's comments to him.  (Kowalewski's Opp, ECF No. 19, at 12.)

Kowalewski's chain of command, although Kowalewski maintains that he was never informed of this decision.  (Def.'s Ex. 10, Decl. of Brenda Brooks, at 1–2; *see also* Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 1.)

In October 2009, Lynn Griffin-Bell, an African-American woman, became Kowalewski's first-level supervisor.  Griffin-Bell also supervised eight other employees, five of whom were men; additionally, of the eight employees, five were white, and three were African-American.  (Def.'s Mot. to Dismiss at 17.)[3]  According to Kowalewski, Griffin-Bell engaged in a variety of inappropriate behavior towards him, which he thought was based on his gender.  She frequently called him "Sweetie," "Honey," and "Love,"[4] and acted "flirty" by smiling and winking at him, although he did not "know what her intention was."  (Def.'s Ex. 6, Dep. of Kowalewski, at 37:3–11, 39:3–5, 145:9–19, 146:7–13.)  Griffin-Bell told him about the NGA "sex scene" as well as her own sexual relationships, and described the "best locations [at work] to do these things."  (*Id.* at 231:23–232:12.)  On one occasion, she asked Kowalewski to bring her a cup of coffee; without objecting, he did so.  (*Id.* at 39:6–19, 231:14–20.)

Griffin-Bell denies speaking with Kowalewski about her sexual relationships or places on the Bethesda NGA complex where she engaged in "on the clock transgressions."  (Def.'s Ex. 9, Investigative File, Mar. 29, 2010, Email from Griffin-Bell, at 70.)  Additionally, she denies talking to him about the NGA "sex scene."  (Def.'s Ex. 3, Decl. of Griffin-Bell, at 3.)  Other

---

[3] According to Kowalewski, many of the individuals supervised by Griffin-Bell worked in a different location from him, so he had little to no interaction with some individuals.  (Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 3.)

[4] Griffin-Bell used the same or similar names with others working at NGA, including both men and women and even senior executive Celia Hopkins.  (Def.'s Ex. 4, Decl. of Hopkins, at 3; Def.'s Ex. 9, Investigative File, Decl. of Emily Brittle, at 511–12; Def.'s Ex. 12, Decl. of Raymond Carter, at 2.)  She also referred to Kowalewski's African-American co-worker, Ray Carter, as the "love doctor" or "love machine."  (Def.'s Ex. 9, Investigative File at 12; *see also id.*, Decl. of Kowalewski, at 412.)

NGA employees indicate that they never heard Griffin-Bell discussing such matters. (Def.'s Ex. 4, Decl. of Hopkins, at 4; Def.'s Ex. 9, Investigative File, Decl. of Ron Ross, at 488.)

In addition to claiming gender discrimination, Kowalewski alleges that Griffin-Bell treated him differently from his African-American peers. She called him "[b]lond-haired, blue-eyed," and made reference to "black solidarity." (Def.'s Ex. 6, Dep. of Kowalewski, at 145:3–19; Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 412.) Griffin-Bell told him that "African-Americans watch each others' [sic] backs." (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 402.) If Kowalewski's African-American co-workers missed deadlines, Griffin-Bell would give them a "friendly reminder;" but if he missed a deadline, she threatened him or implied that he was an incompetent employee. (Def.'s Ex. 6, Dep. of Kowalewski, at 82:23–85:1.) Likewise, Griffin-Bell "publicized" an African-American employee's success by telling management; however, when she received positive feedback regarding Kowalewski's work, she did not share this information with management. (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 416.) Griffin-Bell also made herself available to African-American employees through implementing an "open door policy." (*Id.* at 406.) Kowalewski, by contrast, had to make appointments with Griffin-Bell if he wanted to speak with her. (*Id.*) Kowalewski additionally claims that he had to follow a different process for requesting leave than his African-American co-workers. (Def.'s Ex. 6, Dep. of Kowalewski, at 97:2–100:8.)

According to Kowalewski, Griffin-Bell deprived him of a number of opportunities to further his career. At one point, Griffin-Bell "implied" that she had prevented Kowalewski from applying for a job at the Pentagon, telling him that an African-American man had received the job and referring to "black solidarity." (*Id.* at 70:24–73:5.) Griffin-Bell also removed him from an advanced clearance assignment, and gave the assignment to an African-American co-worker

who "did not have the skills or abilities for" the job. (*Id.* at 260:15–261:25.) Unlike certain African-American co-workers, Kowalewski was discouraged from working in the front office, which Griffin-Bell referred to as the "boys club." (*Id.* at 256:10–23; Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 3; *see also* Def.'s Ex. 3, Decl. of Griffin-Bell, at 4.)

Griffin-Bell denies treating Kowalewski differently from his African-American colleagues. She maintains that she never made any racial comments, and other NGA employees confirm that they never heard her make such remarks. (Def.'s Ex. 9, Investigative File, Decl. of Griffin-Bell, at 467; *id.*, Decl. of Ron Ross, at 488; Def.'s Ex. 12, Decl. of Carter, at 2.) As for Kowalewski's claims that African-American co-workers received preferential treatment, the defendant points out that African-American employees were dissatisfied with how Griffin-Bell treated them. (Def.'s Ex. 12, Decl. of Carter, at 1; Def.'s Ex. 13, Decl. of Kristyl Grierwhite, at 1.) Moreover, according to Carter, Griffin-Bell did not maintain an open-door policy with him, and Griffin-Bell likewise denies maintaining an open door policy with anyone. (Def.'s Ex. 12, Decl. of Carter, at 3; Def.'s Ex. 9, Investigative File, Decl. of Griffin-Bell, at 468–69.) Griffin-Bell also explains that she "never had to forward positive emails about Todd's behavior to the chain of command," because those emails "already [] included [the] supervisory chain on them;" she did, however, share Kowalewski's successes at staff meetings. (Def.'s Ex. 3, Decl. of Griffin-Bell, at 4.) Next, asserting that she had "absolutely nothing to do" with the hiring decision, Griffin-Bell denies blocking Kowalewski from applying for the Pentagon job. (*Id.* at 2; *see also* Def.'s Ex. 5, Decl. of Clancy, at 2 (explaining that Griffin-Bell was not "in a position to block any employee from a promotion").) In fact, she disagreed with the hiring decision, and recommended against it, as the person hired "did not have the skills" for the position. (Def.'s Ex. 3, Decl. of Griffin-Bell, at 2.) Turning to Kowalewski's claim that he was removed from an

advanced clearance assignment, Griffin-Bell and Ron Ross explain that the assignment was part of his training, so it was merely temporary.  (*Id.* at 3; *see also* Def.'s Ex. 9, Investigative File, Decl. of Ron Ross, at 485.)  Finally, responding to Kowalewski's claim that he was discouraged from working in the front office, Griffin-Bell claims that she never discouraged him from working there.  (Def.'s Ex. 3, Decl. of Griffin-Bell, at 4.)  She explains that working in the front office required more experience than Kowalewski had as a newly hired employee and, thus, a more experienced co-worker worked there.  (*Id.*)

According to Kowalewski, Griffin-Bell threatened him, although she maintains that she merely reminded him of his probationary status when he behaved disrespectfully towards his superiors.  (Def.'s Ex. 9, Investigative File, Decl. of Griffin-Bell, at 469–70 ("A senior executive made a complaint that Todd had displayed aggressive and unacceptable behavior . . . .  I explained to Todd that he was on probation, this type of behavior would not be tolerated, . . . and [] he could be written up for such behavior.").)  Kowalewski, however, asserts that she referred frequently to Ron Ross and to Kowaleski's former co-worker, Joi Grieg, who was removed from NGA after working for Griffin-Bell.  (Def.'s Ex. 6, Dep. of Kowalewski, at 90:16–91:24; *see also* Kowalewski's Opp, ECF No. 19, at 4.)  Additionally, she told Kowalewski that she was "untouchable," and she could "write [him] up." (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 408, 417.)

Kowalewski states that he informally complained of Griffin-Bell's behavior to Brenda Brooks, Ron Ross, Pat Clancy, and Brenda Meyer, among others.  (Def.'s Ex. 6, Dep. of Kowalewski, at 203:18–204:5; *see also* Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 2.)  According to Brooks, however, the first time Kowalewski told her of the alleged discrimination was during the meeting when he tendered his resignation.  (Def.'s Ex. 9, Investigative File, Decl.

of Brooks, at 502; *see also* Def.'s Ex. 10, Decl. of Brooks, at 3.)  Ron Ross also denies that

Kowalewski reported harassment to him.  (Def.'s Ex. 9, Investigative File, Mar. 26, 2010, Email

from Ron Ross, at 91–92.)  Likewise, Meyer indicates that Kowalewski never told her that

Griffin-Bell was harassing him or subjecting him to a hostile work environment.  (*Id.*, Decl. of

Meyer, at 498.)

Kowalewski claims that he met with Griffin-Bell and Brooks on February 4, 2010, for

what he was told would be a confidential mediation.  (Def.'s Ex. 6, Dep. of Kowalewski, at

107:6–23, 157:10–15.)  During the meeting, Kowalewski told them that he was working in a

hostile environment, but he did not allege that he was being treated differently because of his

race.  (*Id.* at 158:18–159:5.)  He also expressed that certain co-workers lacked writing skills.  (*Id.*

at 105:23–106:15, 159:13–16.)  Although Griffin-Bell acknowledges the February 4, 2010,

meeting with Kowalewski and Brooks, she said it was held to discuss "mounting issues with

Todd's aggressive and agitated behaviors."  (Agency Response to Complainant's Discovery

Requests, ECF No. 31-6, at 4.)

Following the meeting with Griffin-Bell and Brooks, in late February 2010, Kowalewski

claims that he contacted the Office of Diversity Management and Equal Employment

Opportunity ("ODE") by phone.  (Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 5.)  Then, on

March 5, 2010, he physically went to ODE to file a complaint.  (*Id.*; *see also* Def.'s Ex. 14, Decl.

of Gloria Cunningham, at 1.)  Records at ODE show that Kowalewski filed an informal

complaint on March 12, 2010.  (Def.'s Ex. 14, Decl. of Cunningham, at 1.)  Additionally,

Patricia Langford, the Assistant Inspector General of Investigations at NGA, indicates that, on

March 9, 2010, the NGA Office of the Inspector General ("OIG") received a complaint from

Kowalewski alleging that he was the victim of racial discrimination. (Def.'s Ex. 18, Decl. of Langford, at 1.)

As a result of his complaints, Kowalewski claims that Griffin-Bell attempted to create a hostile work environment by turning his co-workers against him. Griffin-Bell told employees that Kowalewski was speaking negatively about them, and stated that "Todd is out to get you." (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 404.) Moreover, a co-worker, Pat Thornton, knew "in extremely great detail" the contents of the February 4, 2010, meeting. (Def.'s Ex. 6, Dep. of Kowalewski, at 156:21–24.)

Carter, however, disputes that Griffin-Bell attempted to turn him against Kowalewski; she never told him that Kowalewski criticized him, or that he should "watch [his] back." (Def.'s Ex. 12, Decl. of Carter, at 1–2.) Grierwhite explains that Kowalewski and Thornton spent a lot of time together and "did not interact with other members of the team." (Def.'s Ex. 13, Decl. of Grierwhite, at 1–2.) She also recalls that, following a conversation with Kowalewski about her pay grade, she "found out that he was criticizing [her] experience and job performance" and that he "suggested that he should have been the [higher pay grade] instead of [her]." (*Id.* at 1.)

Kowalewski asserts that Griffin-Bell's behavior towards him culminated in his constructive discharge on March 16, 2010. On that day, he met with Brooks, Griffin-Bell, and another representative from HD. (Def.'s Ex. 6, Dep. of Kowalewski, at 193:20–24.) He was told that he was being terminated for his "conduct" and "work style," but was given the option to resign. (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 427; *see also* Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 5.)[5] Kowalewski opted to resign, and returned to his desk to pack

---

[5] Kowalewski maintains that he had no reason to suspect prior to March 16, 2010, that he would be terminated, as he had not received any formal discipline. (Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 5.)

up his things.  (Def.'s Ex. 9, Investigative File, Decl. of Kowalewski, at 426–27.)  When he got

to his desk, however, it was in a state of disarray, and personal items—including notes he had

taken on Griffin-Bell's behavior towards him—were missing.  (*Id.* at 426; Pl.'s Ex., July 18,

2013, Aff. of Kowalewski, at 5.)  A co-worker later reported that she had overheard Griffin-Bell

and another employee going through Kowalewski's desk, stating that "they were doing it with

glee . . . as if they were on a big frolic."  (Pl.'s Ex., July 18, 2013, Decl. of Emily Brittle.)

According to the defense, Kowalewski's resignation was preceded by concerns about his

performance, including disrespectful behavior toward his supervisors.  Shortly after Kowalewski

began working at NGA, around November 2009, he met with Clancy, Brooks, and another

individual from the recruitment office to discuss his recruitment experiences; also present at the

meeting was Kim Thompson, a senior executive in the recruitment office.  (Def.'s Ex. 5, Decl. of

Clancy, at 1.)  According to Clancy, Kowalewski became angry when Thompson suggested

during the meeting that he may have had a misunderstanding with Ryan Ross.  (*Id.*)  "He

snapped at her and said something to the affect [sic] that there had been no misunderstanding."

(*Id.*; *see also* Def.'s Ex. 10, Decl. of Brooks, at 2 (stating that Kowalewski was "aggressive and

loud" and that he was "disrespectful" towards Thompson).)  After this incident, Brooks

recommended that Kowalewski be terminated during his probationary period, but Clancy was

not in favor of removing him.  (Def.'s Ex. 5, Decl. of Clancy, at 1; *see also* Def.'s Ex. 10, Decl.

of Brooks, at 2.)  Kowalewski denies that he acted inappropriately during this meeting and

asserts that, after this meeting, he "was never counseled in any way regarding [his] interaction

with Kim Thompson."  (Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 4.)

On another occasion, in early November, Kowalewski met with Celia Hopkins, a senior

executive at NGA.  (Def.'s Ex. 4, Decl. of Hopkins, at 1–2; *see also* Def.'s Ex. 10, Decl. of

Brooks, at 2.)  Hopkins indicates that, during the meeting, Kowalewski was cordial at first, but then became angry, telling her that he had been "lied to from the beginning" and even yelling at her.  (Def.'s Ex. 4, Decl. of Hopkins, at 2.)  When Hopkins told him that he was acting inappropriately, Kowalewski stormed out of the office and never offered an apology.  (*Id.* at 2–3.)  Brooks states that, following this incident, Hopkins spoke to her about Kowalewski's behavior during the meeting.  (Def.'s Ex. 10, Decl. of Brooks, at 2.)  Although she asked Hopkins to provide a written statement, Brooks never received one.  (*Id.* at 3.)  Brooks recommended again that Kowalewski be terminated, but no adverse action was taken against him.  (*Id.*)  Griffin-Bell notes that she was not in favor of removing Kowalewski, as she "saw potential in [him]."  (Def.'s Ex. 3, Decl. of Griffin-Bell, at 2.)

While Kowalewski admits that he was "emotional" during the meeting with Hopkins, he denies that he was "inappropriate or threatening in any way."  (Pl.'s Ex., July 18, 2013, Aff. of Kowalewski, at 4.)  Kowalewski claims that he was afraid during the meeting because Hopkins made statements like "the Intelligence Community is small" and he "would not have a good career if [he] wasn't careful."  (*Id.*)  She also told him that she was friends with Griffin-Bell.  (*Id.*)  After the meeting, Kowalewski indicates that Griffin-Bell spoke with him "in passing" about Hopkins.  (*Id.*)  But she did not "ma[ke] it sound as though [his] job were in jeopardy," nor did she say that Hopkins had felt threatened during their meeting.  (*Id.*)

The defendant claims that Kowalewski's inappropriate behavior continued during a staff meeting on March 2, 2010.  According to Griffin-Bell, Kowalewski went through her notebook without her permission.  (Def.'s Ex. 3, Decl. of Griffin-Bell, at 5.)  He began "egging [her] on," yelling at her to "go ahead, you think you're the best manager.  What do you know about teaming?"  (*Id.*; *see also* Def.'s Ex. 13, Decl. of Grierwhite, at 2 (stating that Kowalewski "was

intimidating Lynn by verbally challenging her in a loud manner").)  She also claims that

Kowalewski was "aggressive" towards co-worker Brittle, and called her "stupid."  (Def.'s Ex. 3,

Decl. of Griffin-Bell, at 5.)  Brittle, however, states that, while Kowalewski was "assertive"

during the staff meeting, she did not find him "physically aggressive or intimidating in any way."

(Pl.'s Ex., July 18, 2013, Decl. of Brittle.)  She also states that he did not call her "stupid."  (*Id.*)

Likewise, according to Thornton, Kowalewski did not call Brittle "stupid" during the staff

meeting, nor was he acting aggressively or "ranting."  (Pl.'s Ex., July 17, 2013, Decl. of

Thornton.)  Following the staff meeting, Brooks recommended for the third time that

Kowalewski be terminated during his probationary period, and management agreed to remove

him.  (Mar. 4, 2010, Email from Brooks, ECF No. 31-7, at 1; *see also* Def.'s Ex. 10, Decl. of

Brooks, at 4.)  According to Kowalewski, there was no mention of his behavior at the March 2,

2010, staff meeting during his termination meeting.  (Pl.'s Ex., July 18, 2013, Aff. of

Kowalewski, at 5; *see also* Def.'s Ex. 9, Mar. 16, 2010, Termination Letter, at 456 (explaining

that Kowalewski was being terminated during his probationary period because of his "conduct

and work style").)

## STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact

is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A

party opposing a properly supported motion for summary judgment 'may not rest upon the mere

allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## ANALYSIS

### A. Motion for Discovery

Rule 56(d)(2) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d)(2). Denial of additional discovery is appropriate, however, when the materials sought by the requesting party could have been discovered earlier, including in the course of administrative discovery. *See Volochayev v. Sebelius*, 513 Fed. App'x 348, 351–52 (4th Cir. 2013);[6] *see also Khoury v. Meserve*, 268 F. Supp. 2d 600, 612 (D. Md. 2003). Additionally, the district court's denial of a Rule 56(d) motion is appropriate when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see also Newsom v. Barnhart*, 116 Fed. App'x 429, 432 (4th Cir. 2004) (affirming the district court's

---

[6] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

denial of further discovery "[g]iven the breadth of the administrative record"); *Khoury*, 268 F. Supp. 2d at 612 (determining a motion for summary judgment was not premature when a "full and detailed factual record" had already been created).

Here, the court agrees with the defendant that denial of Kowalewski's Rule 56(d) motion is appropriate because: (1) he could have sought the desired materials during the administrative case before the Equal Employment Opportunity Commission ("EEOC"); and (2) in any event, the record in this case is sufficiently developed to make a summary judgment determination. Kowalewski's claim that he has not had sufficient time for discovery is belied by the fact that the earlier administrative case spanned from March 10, 2011, to August 15, 2012, a period of more than 17 months. (Decl. of Jack Rickert, ECF No. 31-1, at 1.) Discovery lasted for over 11 months: Kowalewski served his initial discovery request on April 4, 2011, and the NGA continued to supplement its responses through March 10, 2012. (*Id.*)

Kowalewski complains that the defendant now makes new factual allegations, but all of the "new" information could have been obtained earlier had he pursued administrative discovery more diligently. Indeed, all of the information requested by Kowalewski in his motion for discovery was available to him during the administrative discovery phase. For example, Kowalewski complains that the defendant describes "new" incidents where he behaved inappropriately, but he never asked the NGA to identify and describe all incidents of his misconduct. Similarly, he indicates that he would like to "query Griffin-Bell," (Pl.'s Mot. for Discovery, ECF No. 21, at 3–4); however, on two previous occasions, he was offered the opportunity to depose Griffin-Bell and other NGA employees, and he never did so. (Decl. of Rickert at 10.) Kowalewski, in short, failed to obtain information that was available to him during a lengthy administrative discovery period.

In any event, the court is satisfied that the record produced during the administrative discovery period is sufficiently full and detailed to rule on the summary judgment motion. Responding to Kowalewski's request for all emails sent to him and by him, the NGA produced thousands of pages of discovery. (*Id.* at 1–2.) The investigative file created by the Civilian Personnel Management Service Investigations and Resolutions Division of the Department of Defense is well over 500 pages long, and contains sworn affidavits from 7 key witnesses. (*See* Def.'s Ex. 9, Investigative File.) Additionally, Kowalewski was deposed during discovery, as were two of his former co-workers, Thornton and Craig Donovan. His motion for discovery, therefore, will be denied.

## B. Motion for Summary Judgment

### 1. Discrimination Based on Race and Gender

Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "As a general matter, to make out a *prima facie* case for employment discrimination, the Plaintiff must show that: (1) he is a member of a protected group; (2) he earned satisfactory performance marks, (3) he suffered an adverse employment action; and (4) other similarly situated employees outside his protected class were treated more favorably." *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 573 (D. Md. 2000). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence that the employment decision was made for a legitimate, nondiscriminatory reason. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). Finally, once the defendant meets its burden of production by proffering a nondiscriminatory

explanation for its decision, the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason is merely pretext for discrimination. *Id.*

Kowalewski alleges that he suffered a myriad of adverse employment actions, including being prevented from applying for jobs and promotions, being removed from an advanced clearance assignment and other complex accounts, and being discouraged from working in the front office. Assuming, without deciding, that he may establish a prima facie case of discrimination based on those actions, the defendant provides legitimate, nondiscriminatory reasons for the actions, which Kowalewski is unable to rebut. To rebut Kowalewski's claim that he was prevented from applying for certain jobs and promotions, the defendant explains that a "hiring blitz" had been implemented to fill vacancies. (Def.'s Ex. 3, Decl. of Griffin-Bell, at 2–3.) Pursuant to the "hiring blitz," open positions were not advertised; instead, vacancies were filled by choosing among candidates in the "hiring blitz pipeline." (*Id.*) Next, as for his claim that he was removed from an advanced clearance assignment, the defendant responds that the assignment was part of his training and merely temporary. The defendant also contradicts Kowalewski's claim that his security clearance was more advanced than other NGA employees'. (Def.'s Ex. 15, Decl. of Brent Speier, at 1.) Finally, as for why another co-worker worked in the front office, the defendant explains that working in that office required more experience than Kowalewski had as a new NGA employee; indeed, a more experienced employee worked there. (Def.'s Ex., Decl. of Griffin-Bell, at 4.) Because Kowalewski does not offer any evidence to support a finding of pretext, the above employment actions cannot form the basis of a discrimination claim.

Next, Kowalewski claims that he was treated differently from his African-American colleagues with respect to the enforcement of deadlines and other office procedures, having

positive feedback "publicized," and requesting to meet with Griffin-Bell. The court concludes that those alleged actions fall short of adverse employment actions, such that they cannot form the basis of a Title VII discrimination claim. As stated by the Fourth Circuit, "[a]n adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (citation and internal quotation marks omitted). "Conduct short of ultimate employment decisions can constitute adverse employment action," *id.*, but "[a]n action that merely causes an employee irritation or inconvenience" does not qualify. *Spriggs v. Public Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Turning to Kowalewski's claim that he was reprimanded for missing deadlines while his African-American colleagues were merely given "friendly reminders," he does not explain—nor can the court determine—how this affected the terms, conditions, or benefits of his employment. His ability to meet deadlines, for instance, was not cited as a reason for his termination. Nor was it a reason for any change in his job responsibilities. Next, while implementing different leave procedures could constitute an adverse employment action, here Kowalewski only alleges that he had to submit a leave slip and put his name on the office calendar to request leave. He does not allege that he was denied leave as a result of these requirements. The court cannot conclude, therefore, that the leave requirements were so significant as to affect the terms, conditions, or benefits of his employment.[7] Kowalewski also takes issue with how Griffin-Bell failed to

---

[7] Regardless of whether Kowalewski's leave procedures constituted an adverse employment action, it appears that he never raised this claim with the EEOC and, as a result, failed to exhaust administrative remedies. Accordingly, even if Kowalewski were able to establish a prima facie case with regard to this claim, it must be dismissed for lack of subject matter jurisdiction. *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim.").

publicize his successes. At best, however, he alleges an action that caused him irritation. Griffin-Bell's alleged failure to forward positive feedback to management did not affect any hiring or promotion decisions, nor was a lack of positive feedback considered in his termination. Kowalewski finally claims that Griffin-Bell maintained an open-door policy with other co-workers but not with him. The court cannot find—and Kowalewski does not allege—any harm caused by having to make an appointment to meet with Griffin-Bell. In sum, Kowalewski cannot allege discrimination based on the enforcement of deadlines and other office procedures, how positive feedback was shared with management, and how he requested meetings with Griffin-Bell.

Finally, Kowalewski alleges that Griffin-Bell's decision to terminate him was based on his race and gender. The court concludes, however, that he again fails to establish a prima facie case. To make out a prima facie case of discriminatory termination, the plaintiff must establish that: (1) he belongs to a protected group; (2) he was terminated; (3) he was qualified to remain in his position; and (4) the position remained open to similarly qualified applicants after his dismissal, or was filled by someone with similar qualifications outside his protected class. *See Hill*, 354 F.3d at 285; *see also Davis v. Baltimore Hebrew Congregation*, __ F. Supp. 2d __, 2013 WL 6206993, at *8 (D. Md. 2013). Here, Kowalewski does not provide any evidence that his position at NGA remained open to similarly qualified individuals, or that it was later filled by someone of a different race or gender. Nor do the circumstances of Kowalewski's discharge permit an inference of discrimination: the decision to terminate him was not made by Griffin-Bell alone but rather a committee of his supervisors. Brooks and her supervisor, Sandy Renfrow, suggested that he be terminated, and then the chain of command, including Clancy, Meyer, Pat Hudson, and Griffin-Bell, agreed with her recommendation. (*See* Def.'s Ex. 10, Decl. of Brooks,

at 4; *see also* Def.'s Ex. 3, Decl. of Griffin-Bell, at 5.)  Griffin-Bell then signed the removal

notice.  (Def.'s Ex. 3, Decl. of Griffin-Bell, at 5.)  The record does not support a finding that

Griffin-Bell was the one who actually decided to terminate Kowalewski, or that she was the one

principally responsible for the termination decision.  *Cf. Hill*, 354 F.3d at 288–89 (explaining

that, to establish a prima facie case of discriminatory termination, the employee must show that

"the one 'principally responsible' for, or the 'actual decisionmaker' behind" the termination

decision harbored discriminatory animus).[8]  The court, in sum, will grant the defendant's motion

for summary judgment as to Kowalewski's discrimination claim.

## 2. Hostile Work Environment

To establish a hostile work environment claim, the plaintiff must show that: "(1) []he

experienced unwelcome harassment; (2) the harassment was based on [his] gender, race, or age;

(3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and

create an abusive atmosphere; and (4) there is some basis for imposing liability on the

employer."  *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).  In

determining whether conduct is sufficiently severe or pervasive to establish an actionable hostile

work environment claim, courts look to the "totality of the circumstances," including the

"frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)

(citation and internal quotation marks omitted).  The plaintiff must show both that he

---

[8] Even assuming that Kowalewski could make out a prima facie case of discriminatory termination, the defendant provides a legitimate, nondiscriminatory reason for his termination: his inappropriate behavior towards co-workers and even supervisors.  Kowalewski offers no evidence from which a reasonable jury could find the proffered reason was merely pretextual. His subjective belief that he was terminated due to his race and gender is insufficient to create a genuine dispute of material fact.

"subjectively perceive[d] the environment to be abusive" and that "the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citations and internal quotation marks omitted).

Kowalewski argues that he was subjected to a hostile work environment because Griffin-Bell called him "blond-haired, blue-eyed," referred to him by names such as "Honey" and "Sweetie," told him about the NGA "sex scene," threatened him, and attempted to ostracize him from his co-workers. The defendant, in response, admits that Griffin-Bell called him "Honey," "Sweetie," and "Love," but denies the rest of Kowalewski's allegations. Even assuming all of the allegations are true, Kowalewski's claims regarding the "frequent" nature of the harassment are too vague to show that Griffin-Bell's behavior was sufficiently pervasive.[9] *Cf. Sunbelt Rentals, Inc.*, 521 F.3d at 315–17 (determining a Muslim employee suffered severe and pervasive religious harassment when he described in detail how he was subjected to "repeated comments that disparaged both him and his faith," "was persistently harassed about his appearance," and was harassed "several times" about his prayer sessions). Moreover, given the context of Griffin-Bell's statements and actions, the specific incidents described by Kowalewski were not so severe as to change the conditions of his employment. *Cf. id.* at 317–18 (noting that the harassing behaviors were directed only at a Muslim employee, which suggested that they "were . . . motivated by a disdain for [his] faith"). The record shows that Griffin-Bell used names like "Honey" and "Sweetie" with all her co-workers and even a superior. At least two of her subordinates recognized that she was, quite simply, a poor manager. (*See* Def's Ex. 12, Decl. of Carter, at 1, 3; Def.'s Ex. 13, Decl. of Grierwhite, at 1.) In this context, a reasonable person in

_____

[9] In fact, it appears from the record that Griffin-Bell frequently used names like "Honey," "Sweetie," and "Love," but her other comments were made just once or occasionally.

Kowalewski's position would not find Griffin-Bell's single request for a cup of coffee physically threatening or humiliating. Nor would a reasonable person be physically threatened or humiliated by her reference to "black solidarity" when discussing the Pentagon job. Thus, while Griffin-Bell's conduct was certainly inappropriate, the court does not find it was so pervasive or severe to make out a hostile work environment claim.

In any event, the court cannot conclude that Griffin-Bell's conduct was motivated by Kowalewski's race or gender. As acknowledged above, Griffin-Bell often spoke inappropriately with her co-workers. Apparently she had difficulty getting along with her co-workers, including female and African-American colleagues. (*See, e.g.*, Def.'s Ex. 3, Decl. of Griffin-Bell, at 3; Def.'s Ex. 13, Decl. of Grierwhite, at 1.) An African-American co-worker, Grierwhite, even suggests that Griffin-Bell favored white employees. (Def.'s Ex. 13, Decl. of Grierwhite, at 1.) Carter, an African-American man, also confirms that Griffin-Bell referred to him as the "love doctor." Kowalewski, in short, cannot show that Griffin-Bell treated him differently from other similarly situated employees. The defendant's motion for summary judgment on Kowalewski's hostile work environment claim will be granted.

### 3. Retaliation

To make a claim for retaliation, the plaintiff must establish the following three elements: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). Because the employer must have taken the adverse action as a result of the plaintiff engaging in the protected activity, "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element . . . ." *Dowe v. Total Action Against Poverty in Roanoke*

*Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).  If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its decision, which the plaintiff must then rebut.  *Equal Emp't Opportunity Comm'n v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005)

Kowalewski argues that he has established a prima facie case of retaliation: he engaged in protected activity by complaining to ODE and OIG and informally complaining to his superiors about Griffin-Bell's behavior and, as a result, he was threatened, ostracized by his co-workers, and terminated from the NGA.[10]  The defendant, however, argues that Kowalewski's retaliation claim must be dismissed because there is nothing to suggest that Griffin-Bell was aware of his ODE and OIG complaints when she engaged in the above behaviors.  The court agrees with the defendant that there is no evidence indicating that Griffin-Bell knew of Kowalewski's complaints to ODE and OIG.  Griffin-Bell was not contacted by the EEOC until March 22, 2010, 6 days after Kowalewski was discharged from the NGA.  (Def.'s Ex. 14, Decl. of Cunningham, at 1.)  It appears that she was never contacted by OIG because that office elected not to open an

---

[10] Kowalewski also claims that, because of his complaints, he was prevented from applying for jobs and promotions, removed from an advanced clearance assignment and other complex accounts, and discouraged from working in the front office. But, as explained above, the defendant had legitimate, nondiscriminatory reasons for those actions, which Kowalewski is unable to rebut.  Thus, they cannot form the basis of a retaliation claim.  Likewise, the court concludes that Kowalewski's claims regarding the enforcement of deadlines and other office procedures and other "petty harassments"—including being ignored at staff meetings and not being acknowledged for accomplishments—cannot form the basis of a retaliation claim.  As correctly stated by Kowalewski, the standard for proving an adverse employment action is more lenient for retaliation claims than discrimination claims.  *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (concluding that, to qualify as an adverse employment action for purposes of a retaliation claim, the action must be "materially adverse to a reasonable employee" so that the worker would be dissuaded from making a complaint).  Nevertheless, the court cannot say that the actions alleged by Kowalewski are so severe that they would prevent a reasonable employee from making a complaint of discrimination.

investigation.  (Def.'s Ex. 18, Decl. of Langford, at 1.)

But that in itself does not mean Kowalewski's retaliation claim fails: the defendant's argument overlooks that informal complaints may be considered protected activity as well.  *See Navy Fed. Credit Union*, 424 F.3d at 406; *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).  As pointed out by Kowalewski, Griffin-Bell admits some knowledge of Kowalewski's informal complaints: she states that he had told management that she blocked him from a promotion due to his race.  (Agency Response to Complainant's Discovery Requests at 3.).  Nevertheless, even assuming that Griffin-Bell was aware of Kowalewski's complaints, as explained above, there is nothing to suggest that she was the actual decisionmaker or principally responsible for the decision to terminate him.  *See Hill*, 354 F.3d at 298–99.  Additionally, as already stated, the defendant explains that Kowalewski was terminated because of inappropriate behavior towards co-workers and even supervisors, and Kowalewski cannot show by a preponderance of the evidence that the defendant's proffered reason for his termination is merely pretextual.  The defendant's motion for summary judgment on Kowalewski's retaliation claim will be granted.

## CONCLUSION

For the reasons stated above, the defendant's motion to dismiss or for summary judgment—treated as a motion for summary judgment—will be granted.  Kowalewski's motion to allow time for discovery will be denied.  A separate order follows.


March 24, 2014                                                    /s/
Date                                                    Catherine C. Blake
                                                    United States District Judge